# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

UNITED STATES OF AMERICA,     )
                                       )
         Plaintiff,           )
                                       )
v.                              )      No. 3:10-cr-00260
                                     )      Chief Judge Haynes
BASHIR YASIN MOHAMUD,     )
HAMDI OSMAN,               )
MUSTAFA AHMED MOHAMED,   )
                                       )
        Defendants.       )

# M E M O R A N D U M

The Memorandum addresses the various Defendants' motions for release or review of prior detention Orders. The Court granted those motions (Docket Entry No. 3049) at the February 1, 2013 status conference, but announced that its findings and authorities for those Orders would be submitted later. The Government filed a notice of appeal of those Orders. (Docket Entry No. 3086). Although a Notice of Appeal deprives the district court of jurisdiction, the Court enters these findings as in aid of the appeal, an exception to the general rule on the effect of a notice of appeal. United States v. Sims, 708 F.3d 832, 834 (6th Cir. 2013) (citing Inland Bulk Transfer Co. v. Cummins Engine Co., 332 F.3d 1007, 1013 (6th Cir. 2003).

## A. Defendant Bashir Yasin Mohamud's Renewed Motion for Release

In his renewed motion for release pursuant to 18 U.S.C. § 3143(c)(2), Defendant Bashir Yasin Mohamud cites changed circumstances that warrant his release. On June 21, 2011, the Defendant Mohamud, filed a motion to dismiss, for a severance, bill of particulars and for release

1

(Docket Entry No. 741) with a supporting memorandum. (Docket Entry No. 742). Defendant Mohamud filed exhibits under seal that Defendant contends illustrates the lack of proof that he was involved in any conspiracy to traffic minors or anyone for commercial sex acts. Defendant Mohamud contends Jane Doe Four's statements do not prove any federal crimes. In response, the United States relied upon the four corners of the Second Superseding Indictment. (Docket Entry No. 764).

On November 3, 2011, this Court denied Defendant Mohamud's motion to dismiss for a bill of particulars, for a severance and to compel, but set a hearing on Defendant Mohamud's motion for pretrial release. (Docket Entry No. 961). On November 22, 2011, this Court held a detention hearing (Docket Entry No. 976), after which, Defendant Mohamud filed his proposed findings of facts. The Court denied Defendant Mohamud's motion for release. (Docket Entry No. 1007 and Docket Entry No. 1006, Memorandum).

As to changed circumstances, Defendant Mohamud cites the sworn testimonies of Jane Doe Four that does not implicate Defendant Mohamud in the charged conspiracies, but exculpates him. In her grand jury testimony on July 14, 2010, Jane Doe Four testified that she lacked any significant knowledge of the SOL or Somalian Outlaws or the Somalia Mafia gangs. (Docket Entry No. 2435, Exhibit B). Jane Doe Four denied attending any parties at any hotel rooms. Id. at Exhibit C, p. 2. Jane Doe Four denied knowing any person in 40 photographs of individuals. Id. at Exhibit D, Grand Jury October 6, 2010 testimony at 159, 165, 182, 183, 184, 185, 187, 189, 192, 193, 194, 195, 196, 197, 198, 199, 200, 201, 203, 205, 206, 208, 209, 216, 217, 220, 221, 223, 225, 226, 227 and 228. Jane Doe Four later corrected her false testimony on July 14, 2012. (Docket Entry No. 2437 at Exhibit E, at 32, 57, 58, 59, 61-68, 73, 75-78, 82, 83, 86, 87, 90, 93-96). Jane Doe Four initially denied knowing Defendant Mohamud except for seeing him at the Karmel Mall, in Minnesota. Jane

2

Doe Four specifically denied seeking Defendant Mohamud at any other place other than at the Karmel Mall. Id. at Exhibit F, at 96. At that point, the Government asked her had she seen the person in picture #108 (Defendant Mohamud) anywhere other than the Karmel Mall and she stated "I don't know." Id. at Exhibit G at 97.

After the break in the grand jury proceedings, Assistant United States Attorney Vincent asked Jane Doe Four if she had talked to her lawyer, which she stated that she had. Jane Doe Four then proceeded to identify the person in photograph #107 as "JR." The Indictment identified Defendant Mohamud's alleged street name as "BR." (Docket Entry No. 2435 at 5). Jane Doe Four then admitted her presence with "JR" at the Motel 6 in Richfield, Minnesota. (Docket Entry No 2437, Exhibit G at 99). Jane Doe Four did not state that Defendant Mohamud forced or directed her to that Motel 6, but that she went to the Motel 6 in Richfield on the evening of March 10, 2010, with her friends, including a girlfriend named "Asha." Id. at 100. As to whether her friend "Asha" was to have sex with men for money, Jane Doe Four then testified:

Q.    Was she going there to have sex for money?

A.    No, I don't know.

Q.    You don't know?

A.    No.

Q.    Could be, could be not?

A.    Maybe, maybe not, I don't know.

Q.    Does Asha have sex with men for money?

A.    I don't know.  That I don't know.

Id., Exhibit H at 107.

3

Q.      Were you going to the Motel 6 for the purpose of exchanging sex for money?

A.      No.

Q.      Are you sure?

A.      No, I never.

Q.      When you got to the Motel 6, what happened? It is you and Asha and BR and two other guys.

A.      And I don't know after that what happened.

Q.      You said JR?

A.      Yeah, I don't know what happened after that.

Id. at 111.

Assistant United States Attorney Vincent returned and then questioned her about alleged sex trafficking as follows:

Q.      And so had you ever heard about girls taking Flight 13 guys to hotel rooms?

A.      No.

Q.      Never heard anything about that?

A.      No. Me, I never sell my body so I don't know, you know.

Q.      Anybody ever make money off of you?

A.      No, I never do that. And I would never do it.

Q.      What about Cherry?

A.      Cherry? I don't know.

Q.      Anybody make money off Cherry?

4

A.    I don't know I'm not going to lie.

Q.    What have you heard?

A.    (Witness moves head in a negative response.)

Q.    You are shaking your head, no.

A.    No, nothing.

Q.    No, you didn't what?

A.    I didn't heard nothing.

Q.    You have not heard nothing?

A.    No.

Id. at Exhibit I, at 142-43.

On October 6, 2010, Jane Doe Four returned to the Grand Jury and corrected her testimony, stating that she had deliberately misidentified approximately 40 individuals, and described the activities at the Motel 6 as a party.

Q.    Why did you leave with them?

A.    Because I know Biggie, I trust Biggie because of BiBi.

Q.    Why did they come and pick you up?

A.    Huh?

Q.    You say you know Biggie from BiBi. Why did they come and pick you up? if I could talk a little louder please.

A.    Because they say we going to go to a hotel. I said what you going to do and they was like we just going to chill over there (emphasis added.)

Q.    Where did they tell you you were going to chill?

5

A.     At the hotel.

Q.     I'm sorry?

A.     At the hotel.

Q.     At the hotel.

A.     Yes.

Q.     And so when you left with them where did you go?

A.     At the motel?

Q.     And who else, if anybody, went with you?

A.     Me and them, some girls come.

Q.     What girls come to the hotel?

A.     Ayan, and they got some nicknames that I can't even say.

Id. at Exhibit J at 169-70.

Q.     In relation to Cherry or the other girls that came, was anybody supposed to be paid for being there?

A.     No.

Q.     Are you sure about that?

A.     Yes, I am sure.

Q.     How do you know they were not to be paid?

A.     No, I don't know. That is what I'm saying, I don't know. But I didn't hear nothing about paying nothing.

Q.     And so when you were at the hotel, and Cherry was there and the other two girls and you, and there were five guys, so three females and five guys?

6

A.      (Witness nods in the affirmative.)

Q.      What happened at the hotel?  Walk me through what happened.

A.      It was smoking and drinking.

Q.      And what else?

A.      And then me, I drank a little bit, and then after that I don't know.

Q.      Now-

A.      I actually don't know what happened after the drink.

Id. at Exhibit K at 172-73.

Defendant Mohamud contends that if the Court had possessed this testimony, Defendant

Mohamud may very well have been released under his prior motion for release from detention. The

Court inquired whether the United States had presented proof concerning Defendant Mohamud at

the trial and admitted that it had not.

**B. Defendant Hamdi Osman's Motion to Reconsider Detention Order**

Defendant, Hamdi Osman, who has been incarcerated more than a year in this action, cites

the acquittals for six of her co-defendants and dismissals against several co-defendants. Given these

acquittals and dismissals, Defendant Osman respectfully requests that this Court reconsider its Order

of Detention and allow Defendant Osman to be at home with her family pending the trial of this

action.

**C. Defendant Mustafa Ahmed Mohamed's Motions for Release
(Docket Entry Nos. 2671, 2695, 2699)**

On March 12, 2012, the Government filed a notice of appeal of the Order severing ten (10)

Defendants, Mustafa Mohamed and Bashir Mohamed and others. (Docket Entry No. 1944). (See also

7

Docket Entry Nos.1395, 1603, 1662 and 1667). Defendant Mohamed contends the Court can review the conditions of his detention pending that appeal under 18 U.S.C. § 3143(c)(2). Under that statute, "[t]he judicial officer shall treat a defendant in a case in which an appeal has been taken by the United States under Section 3731 of this title, in accordance with Section 3142 of this title . . . (2) in any other circumstance, release or detain the person under Section 3142". Id.

Defendant Mustafa Mohamed is charged only in Count One and Two of the Second Superseding Indictment. (Docket Entry No. 591-20). The Government's response to his motion for bill of particulars list two overt acts this Defendant is alleged to have committed on March 11, 2010, (Docket Entry No. 1896, p. 19), involving an assault of Jane Doe Four, (Docket Entry No. 1896), citing Jane Doe Four's grand jury testimony. Specifically:

> Q. In addition to Cherry or other girls that came, was anybody supposed to be paid for being there?
>
> A. No.
>
> Q. Are you sure about that?
>
> A. Yes, I am sure.
>
> Q. How do you know they were not to be paid?
>
> A. No, I don't know. That's what I'm saying, I don't know. But I didn't here nothing about paying nothing.

(Docket Entry No. 2437, Exhibit K at 172-73).

### D. Defendant Mohamed Sharif Omar's Motions to Reconsider Detention Order (Docket Entry Nos. 2553, 2808, 2957)

In his first motion (Docket Entry No. 2553), this Defendant cites as changed circumstances

since the detention order on February 3, 2012, the following: government's witnesses have not testified, have been found not credible by a jury, or have recanted their prior statements. As examples, the Defendant cites that Jane Doe One failed to testify at the first trial. Second, given the jury's verdict, Jane Doe Five was not a credible witness at trial because the jury acquitted the Defendants against whom Jane Doe Five testified. Third, witness Fadumo Osman recanted her prior statements while testifying at trial. Defendant cites the prior trial result as proof that the evidence does not warrant his detention.

In its response (Docket Entry No. 2572), the United States asserts that the Defendant's motion focuses on the evidence of his guilt, rather than his dangerousness. The Government argues that dangerousness, rather than evidence of a Defendant's guilt, should be the primary focus on detention, citing <u>United States v. Stone</u>, 608 F.3d 939, 948 (6th Cir. 2010).

In his second motion (Docket Entry No. 2808), Defendant Mohamed Omar notes that the Third Superceding Indictment does not allege he sexually trafficked Jane Doe One (as did the prior indictments), that was the Court's primary basis for detaining Defendant, citing Docket Entry No. 1392 Memorandum. Defendant Mohamed Omar submits that the Government has not presented evidence that Defendant conspired to sexually traffic Jane Doe Two, and mischaracterizes Defendant's jail call with his brother at the June 25, 2012 detention hearing. The Defendant further argues that he was gainfully employed prior to his arrest, and that his only prior conviction as an adult was a reckless driving conviction in 2006.

The Government argues for Defendant's detention based on his dangerousness, not the weight of the evidence against him or his potential guilt. (Docket Entry No. 2850). The Government denies its mischaracterization of the Defendant's conversation with his brother that the Government views

9

as an admission of participation in the conspiracy and related criminal activity.

In his third motion, Defendant Mohamed Sharif Omar argues for the Court to either set a date for trial in this action, or release the Defendant from pretrial detention. (Docket Entry No. 2957). Defendant argues that the Speedy Trial Act has been violated due to the "substantial prejudice" the Defendant has suffered by his prolonged incarceration, citing United States v. Schreane, 331 F.3d 548, 557 (6th Cir. 2003). Defendant has been incarcerated at the Robertson County facility, which is not built for long term confinement. While at that facility Defendant Omar has lost his job; time with friends and family; suffered depression, anxiety; and has been physically assaulted while incarcerated. Additionally, the Defendant argues that due to the delay in trial, his evidence has become stale, and witnesses' memories have faded, which will potentially harm his defense.

### E. Defendant Haji Salad's Motions for Relief from Detention Order
### (Docket Entry Nos. 2656 and 2974)

In Defendant Salad's first motion (Docket Entry No. 2656), this Defendant cites his co-defendants' acquittals as establishing the likelihood of his acquittal and argues that he is neither a risk flight nor dangerous. The Government responds by citing Counts One, Two, Twelve, and Thirteen as carrying a maximum sentence of life imprisonment for this Defendant, and a presumption arises in favor of detention, but the Government retains the burden for persuasion, citing Stone, 608 F.3d at 945. (Docket Entry No. 2663). As to Defendant's dangerousness, the Government also cites the Defendant's criminal history.

In his second motion (Docket Entry No. 2974), the Defendant Haji Salad argues that he is neither a flight risk nor a danger, and that pretrial detention is the exception rather than the rule. United States v. Salerno, 481 U.S. 739 (1987). Additionally, the Defendant argues that his father is

10

willing to act as a third-party custodian in Minnesota. The Government responds citing the proof at the Defendant's detention hearing on August 24, 2012, (Docket Entry No. 2946), and at an October 5, 2012 hearing as warranting his continued detention.

### F. Defendant Yassin Yusuf's Motions for Release
### (Docket Entry Nos. 2962 and 3003)

Defendant Yassin Yusuf argues that since the Court granted his motion for judgment of acquittal and motion for a new trial, there are not any other federal criminal charges against him. (Docket Entry No. 2962). The Government argues that Defendant Yusuf should be detained according to the factors under 18 U.S.C. § 3142, and that the Defendant has not set forth a proper argument for why he should not be detained (Docket Entry No. 2968). The Government also sets forth a list of proposed conditions of Defendant's release, if he is to be released.

In his second motion for revocation of detention order (Docket Entry No. 3003), Defendant Yassin Yusuf again cites the Court's rulings that granted his motions for judgment of acquittal and a new trial. (Docket Entry No. 2959). Defendant also notes that his felony conviction for terroristic threats that involved firing a gun in a public place will be expunged upon completing his probation. The Government cites lack of proof that his terroristic threats conviction will be expunged if he completes his probation, and this conviction is a crime of violence. (Docket Entry No. 3023). The Government also argues that Defendant is dangerous, and should not be released based on his extensive criminal history.

### G. The Trial Record

Because most, if not all, of these motions cite to the lack of evidence at trial, the Court has reviewed the trial record as a consideration of the weight of the evidence as a factor to be considered

11

on determination. 18 U.S.C. § 3142(g)(2).

## 1. Age

The remaining Defendants who seek release from detention cite the acquittals of six of the Defendants and the Government's lack of proof on key elements of the charges.

These Defendants contend that the Government did not prove Jane Doe Two's age beyond a reasonable doubt. The Second Superseding Indictment's allegations concerning Jane Doe Two's age are that "On or about November 26, 2006, Jane Doe Two, a Somalia female and person who had not obtained the age of 13 years, was enticed to engage in sex acts for the ultimate purpose of obtaining her for use in commercial sex acts." (Docket Entry No. 591 at 10). Here, given the provisions of 18 U.S.C. § 1591(a)(2) that applies to a "person who has not attained the age of 18 years", Jane Doe Two's date of birth is a critical element of the Government's proof.[1] On direct examination at trial about her age, Jane Doe Two first testified that she was 17 years of age and was born on September 10, 1996. Jane Doe Two received this information from her mother. Jane Doe Two stated that she learned shortly before her testimony that this birth date is false. Jane Doe Two admitted that in 2007, she represented to Defendant Yusuf that she was 16 years of age. The Government's other proof of Jane Doe Two's age included school records, testimony from classmates and photographs. In addition, Darnell Hughes, a government witness, testified that before the April 2009 trip to Nashville, Jane Doe Two was offered to him for sex, but Hughes declined because he thought Jane Doe Two was too young.

---

[1]Since the filing of the original indictment, the issue of the ages of several Defendants in the Second Superceding Indictment arose about whether they were minors at the time of these offenses. That is jurisdictional in nature. 18 U.S.C. § 5031 et seq. (The Juvenile Delinquency Act") and United States v. Odom, 13 F.3d 949, 957(6th Cir. 1994)(defendants cannot be held responsible for criminal acts as juveniles, but criminal acts of juveniles may be probative of the issue of whether a defendant, once an adult, intended to join a conspiracy).

12

DNA tests and subsequent stipulations establish that the immigration records reflecting Jane Doe's September 10, 1999 birth date are false. The immigration records provide the bases for other public records of Jane Doe Two's birth date. During trial on April 12, 2012, Jane Doe Two who testified that she is a high school senior, listed herself on her Facebook page as working in the "NBA" National Basketball Association and having "studied at Ridgewater College Willmar, MN". (Docket Entry No. 2629, at pp. 1365-66; Docket Entry No. 2465, Witness/Exhibit List, Defendant 29 Exhibit 7, at 4). Darnell Hughes, a government witness admitted that when Jane Doe Two was offered to him for sex, Jane Doe Two showed him a driver identification with an older age. Yusuf's proof included documentary evidence that on her website application, Jane Doe Two listed her birthday as July 26, 1990.[2] (Docket Entry No. 2465, Witness/Exhibit List, Defendant 29 Exhibit 8, at 4). Defendant Yusuf also cites Jane Doe Two's sworn statement filed with Tennessee authorities that she was "abducted" to Tennessee (Docket Entry No. 2465, Witness/Exhibit List, Defendant 29 Exhibit 1, at 4) that is at complete variance to Jane Doe Two's written and oral statements to Nashville police officers and a St. Paul Police officer, shortly after she was taken into custody in Nashville.

Where the age of a witness is a critical issue in a criminal case, expert testimony may be necessary[3], United States v. Katz, 178 F.3d 368, 373 (5th Cir. 1999), but is not always required. See

---

[2]As discussed infra, Defendant Yusuf has since acquired an affidavit that Jane Doe Two was born in 1990 or early 1991 (Docket Entry No. 2875-2, Caabi Affidavit) that the Government disputes.

[3]During trial, late on or about April 8, 2012, the Government served defense counsel with statements of a radiologist and dentist who opined about Jane Doe's age. These reports cited Jane Doe's birth date as September 10, 1994 that based upon immigration records and DNA tests is false. Defendants cited the lack of the bases for these experts' opinions and their qualifications. The Defendants earlier moved for disclosures of experts' reports, but the Government

13

also United States v. O'Malley, 854 F.2d 1085, 1086-88, n.3 (8th Cir. 1988); United States v. Riccardi, 258 F.Supp.2d 1212, 1219 (D. Kan. 2003). Here, the Government's proof of Jane Doe Two's age at trial does not contain any documentary evidence or family proof of Jane Doe Two's birth date. The principal source of Jane Doe Two's age is the testimony of Jane Doe Two that is admissible. Fed. R. Evid. 804(b)(4)(A). Yet, Jane Doe Two's testimony about her age is based upon false information from Jane Doe Two's mother. As discussed infra, these Defendants raise serious issues about the credibility of Jane Doe Two's testimony, but the Government's other proof on Jane Doe Two's age was from lay witnesses, schoolmates and school photographs. Lay testimony is admissible and could provide the jury a basis to find that at the times at issue, Jane Doe Two was under the age of 18. Based upon the principles applicable to the consideration of motions for acquittal, the Court concludes that Defendants' motions for acquittal on the age element should be denied.

## 2. Proof of Defendants Joining a Conspiracy

These Defendants' next challenge is, in essence, whether the Government proved beyond a reasonable doubt that each of these Defendants joined the overarching single conspiracy with other Defendants to engage in the sexual trafficking of minor females. In sum, Kayachith contends that

---

represented that no such reports were to be used, and the Court denied the defense motion. (Docket Entry Nos. 1088, 1213 and 1613). The Court granted the requests to exclude these expert statements based upon the precedents in this district and the fundamental unfairness to the defense to secure experts during the trial. See United States v. Davis, 514 F.3d 596, 605 (6th Cir. 2008) (upholding district court's denial of exclusion of expert report based upon the Government's substantial compliance with Rule 16(a)(1)(G)). No such substantial compliance is present here. Moreover, given the false immigration documents and Jane Doe Two's false birth certificate that was known to the Government a year prior to trial and the disputed circumstances of Jane Doe Two's life prior to arrival in this country, the Court concludes that expert testimony would be necessary for the age issue in a retrial.

14

the Government lacks any proof that Kayachith knew about this conspiracy and voluntarily joined any such conspiracy. Defendant Fahra argues that the Government witnesses, Jane Doe Two and Muna Abdulkidar, identified him as involved only with Jane Doe Two who disputed the dates in the Government's bill of particulars as to when she was at Fahra's apartment before the May 6th trip to Rochester. Fahra also cites the lack of any proof that he went on any travel to offer Jane Doe Two for sex trafficking.

Here, the jury found these Defendants guilty on Count One of the Second Superseding Indictment that charged a conspiracy from 2000 through July 2010 involving four minor Jane Does One through Four, but of those, only Jane Doe Two testified. There was proof that Defendants Adan and Ibrahim interacted with Jane Doe Five in 2000 to engage in prostitution as a minor. At trial, Jane Doe Five testified that in 2000 Defendant Adan induced her into sex trafficking as a minor at the age of 17. As to that inducement, the Government's theory was that Defendant Fadumo Farah, Adan's wife, was a part of this conspiracy that continued to Nashville in 2010, but the jury acquitted Fadumo Farah of such activity. Adan pled guilty to a non-sex trafficking charge. (Docket Entry No. 2115).

According to the Government's proof, Defendants Fahra and Yusuf interacted with Jane Doe Two from November 2006 to May 2007. The Government's proof was that at Defendant Fahra's apartment Jane Doe Two was told by Fahra and others to engage in sex for money and money was collected at Fahra's apartment for non gang members' sex with Jane Doe Two. According to Jane Doe Two, she went to Fahra's apartment as a runaway in November 23, 2006 when Jane Doe Two admitted there was not any prostitution activity. Both Jane Doe Two and Saida Haji testified that at this residence, Jane Doe Two performed sex acts with several individuals before she performed oral sex on Kayachith. Jane Doe Two testified that nothing of value was exchanged for any of these sex

15

acts.

The Government's proof was that in 2007, Defendant Yusuf drove Jane Doe Two to Rochester, Minnesota and Jane Doe Two testified that she was to be sold for sex in Rochester, but Jane Doe Two earlier stated that the Rochester trip was to conduct a robbery. A weapon was found in the vehicle when the vehicle was stopped, and Jane Doe Two was playing with the weapon.

In April 2009, Defendants Kayachith, Fahra and Yusuf interacted with Jane Doe Two. The Government's proof at trial about Kayachith's involvement with Jane Doe Two was in the April 24 – 28, 2009 conduct. According to Jane Doe Two, on April 25, 2009 she overheard Defendants Haji Salad, Abdullahi Afyare, and Liban Sharif Omar, aka Sunderra, planning a trip to Nashville. Andrew Kayachith was present during that conversation, but there was not any proof that Kayachith participated in this conversation. Jane Doe 2 then testified that throughout that day, Kayachith, "AK", drove her and others to alleys in Minneapolis looking and calling people about sex with Jane Doe Two for money. During this time, Jane Doe Two testified that she engaged in sex with ten people in which cash money was collected by Haji Salad. Jane Doe Two's book bag was found in the trunk of Kayachith's automobile. On the morning of April 26, 2009, Jane Doe Two had sex with Biggie without anything of value exchanged, but Kayachith was present at the garage where the sex act occurred. On the morning of April 26, 2009, Jane Doe 2 testified that Abdullahi Afyare contacted a person named "AZ" as a potential purchaser of sex acts. Kayachith was present. On April 27 through April 28, 2009, Kayachith is one of five persons who traveled in an automobile from Minnesota to Nashville, Tennessee with Jane Doe Two who testified that this travel was to exploit her sexually.

Defendant Kayachith cites testimony that at approximately 4 p.m. on April 24, 2009,

16

Defendant Kayachith was at the residence of Abdikarim Ali when Haji Salad and Abdullahi Afyare brought Jane Doe Two to that residence. Both Jane Doe Two and Saida Haji testified that at this residence, Jane Doe Two performed sex acts with several individuals before she performed oral sex on Kayachith. Jane Doe Two testified that the reason she engaged in sex the weekend of April 24, 2009 was because Hollywood told her to have sex with them and he was already mad at her so she was trying to please him. For the remaining part of April 24, 2009, Jane Doe Two testified that she remained with this group of guys and later attended an Africa Night Party. She finished the night at the Americ Inn Hotel where she had sexual intercourse with Defendant Haji Salad and others without any exchange of money.

Defendants cite the testimony of Jane Doe Two on cross-examination admitting that she never stated in her prior statements and/or testimony that any sex acts performed by her on April 25th were in exchange for money. On cross-examination, Jane Doe Two did not testify that Kayachith agreed to prostitute her. Darnell Hughes, a government witness, overheard a conversation between Defendant Haji Salad and Mohamed Ahmed Amalle about Jane Doe Two's sex acts. The jury, however, acquitted Amalle. A person identified as DK was present during this discussion of the sexual acts that Jane Doe Two would perform. Hughes, however, did not relate this conversation about these sex acts to sex trafficking nor state that Kayachith participated in this conversation. Hughes testified that the Defendants were not engaged in any prostitution because if they had, he would have heard about that. Hughes also explained that the Nashville trip had been planned prior to that April 27-29 weekend and, because he was ill, Jane Doe Two wanted to take his place in the vehicle.

On the conspiracy charge "[w]hat is controlling is whether the government has proved that

17

there was an overall agreement on a common goal". <u>United States v. Robertson</u>, 67 Fed. Appx. 257, 265 (6th Cir. 2003) (internal citations omitted). While a "single conspiracy does not become multiple conspiracies simply because each member of the conspiracy does not know every other member," it is necessary to show that each alleged member 'agreed to participate in what he knew to be a collective venture directed toward a common goal.' <u>United States v. Warner</u>, 690 F.2d 545, 549 (6th Cir.1982) (citation omitted).

The jury credited Jane Doe Two's testimony that she was sold for sex at Fahra's apartment with others in 2006 and traveled to Rochester with Yusuf for sex trafficking. Jane Doe Two testified that Kayachith drove Jane Doe Two and other Defendants to various sites in Minneapolis to sell her for sex. The jury credited her testimony about the commercial nature of the sex at Fahra's apartment, in the alleys in Minneapolis and the nature and purpose of the Rochester, Minnesota and Nashville trips. Based upon this proof, the jury found only three Defendants guilty on Count One.

### 3. False Testimony Claims

These Defendants next challenge as false Jane Doe Two's testimony as to her age and other matters about her involvement with these Defendants. Defendant Fahra cites Jane Doe Two's inconsistencies about the dates of the purported acts with him. These Defendants cite Jane Doe Two's material omissions about being sold for sex because such statements are not in her numerous prior interviews with police officers and agents nor in her grand jury testimony about the events of April 25, 2009. The Government contends that any differences and inconsistencies are matters for the jury and as a matter of law, do not constitute the use of false testimony.

#### a. Age

On direct examination, Jane Doe Two testified that her father died before she left Africa for

the United States in 1996.[4] For context, the immigration records reflect that Ibrahim Mohamed Hassan, Jane Doe Two's biological father, arrived in the United States in August 1993 that renders Jane Doe Two's September 10, 1996 birth date false. As discussed below, in 2009 Jane Doe Two also knew who her real father was and knew that the deceased person whom she testified about at trial was her father, in fact, was not her father. Jane Doe Two's mother provided a false birth certificate to the Tennessee authorities for Jane Doe Two's application for monetary benefit arising out of her travel to Nashville (Docket Entry No. 2465, Witness/Exhibit List, Defendant 29 Exhibit 15, at 11). Almost a year prior to trial, lead Government counsel knew that Jane Doe's birth certificate was false.

### b. Jane Doe Two's "Abduction" Statement

Another false statement of Jane Doe Two cited by Defendant Yusuf is Jane Doe Two's sworn statement filed with Tennessee state authorities that she was "abducted" to Tennessee in April 2009. (Docket Entry No. 2465, Witness/Exhibit List, Defendant 29 Exhibit 1, at 4). Shortly after Jane Doe Two was taken into police custody in Nashville for juvenile detention and was away from the Defendants, Metropolitan Nashville Davidson County police officers interviewed Jane Doe Two. In a recorded interview, the Metro police officers instructed Jane Doe Two to tell them the truth about her presence in Nashville. (Docket Entry No. 2465, Witness/Exhibit List, Defendant 17, Exhibit 5, at 4). In this interview and in a contemporaneous handwritten statement for the officers,

---

[4]In addition, Jane Doe Two's mother and biological father submitted false affidavits in this action, signed by Jane Doe Two's counsel, that Ibrahim Mohamed Hassan was not the biological father of Jane Doe Two. Upon Yusuf's motion and proof, the Court ordered DNA testing that established to more than 99% certainty that Ibrahim Mohamed Hassan is Jane Doe Two's biological father and that Jane Doe Two's mother and biological father submitted false affidavits to the Court. (Docket Entry Nos. 2162 and 2164).

19

Jane Doe Two stated that she left her high school to be with her boyfriend; had sex with multiple persons because she became angry with her boy friend; and traveled to Nashville with the Defendants in the vehicle to steal automobile parts for the Lincoln vehicle in which she and several other Defendants were passengers. (Docket Entry No. 2465, Witness/Exhibit List, Defendant 17, Exhibit 2, at 4).

During or shortly after the Metro police interview, Heather Weyker, the government's lead agent in this action, also interviewed Jane Doe Two. In a taped telephone conversation of this interview, Weyker asks Jane Doe Two why she ran away again. Jane Doe Two has a history of repeatedly running away from home with several of the Defendants in this action. Moreover, the proof was that Jane Doe Two actively sought out several of the Defendants. Darrell Hughes, a Government witness who testified under a grant of immunity, testified that Jane Doe Two wanted to take his place on the Nashville trip. Defendants contend that this evidence is wholly inconsistent with Jane Doe Two's sworn statements to Tennessee authorities that she was abducted for the Tennessee trip. As noted earlier, Hughes testified that the Defendants' travel to Nashville was not to engage in any prostitution because if so, he would have known about it.

Defendant Fahra cited Jane Doe's inconsistent statements about the dates that Jane Doe Two engaged in acts of prostitution at various apartments, as contradicting the Government's bill of particulars.[5]

### 4. Jane Doe Two's Material Omissions

---

[5] After review of the Second Superseding Indictment and given the 10 year span of the conspiracy in ten states and multiple cities, the Court granted the defense motions for bill of particulars that required a listing of the dates and locations of the Defendants' acts constituting the conspiracy. (Docket Entry No. 1750, Order).

Another part of the Defendants' false testimony contentions are the material omissions in Jane Doe Two's trial testimony. In sum, the Defendants cite Jane Doe Two's omissions of material facts in her numerous interviews with police officers, agents and her testimony before the grand jury about her observing money exchanged for sex with her. The core of this falsity claim is that despite the numerous interviews with law enforcement agents and government counsel, Jane Doe Two never mentioned that she had sex with at least ten people on Saturday, April 25, 2009, nor that she observed money exchanging hands for sex with her, until trial. The Government contends these defense assertions are jury issues and also cites the jury instructions that in assessing credibility of a witness, consideration is given to any material statements that a witness testifies to at trial, but omitted in prior statements about the events at issue.

At trial, Jane Doe Two, the Government's principal witness, testified during her direct examination that on Saturday, April 25, 2009, prior to the Nashville trip, she had sex with at least ten people in alleys in Minneapolis in exchange for money. On cross-examination, Jane Doe Two again testified that this sexual activity was in exchange for cash money that she observed exchange hands. Defendant Kayachith contends that Jane Doe Two's trial testimony directly contradicts her testimony before the Grand Jury on October 7, 2009 about sex in the alley that was as follows:

Q: Did anything happen to your phone on Saturday?

A: No. I found out that Hollywood and them had it later during the day. So we get

up, went to go get some toothbrush and mouthwash and then we was driving

around in alleys and smoking and meeting up with guys, having sex in cars.

Q. Were any of these guys paying [for the sex]? Why not?

A: Because they were their friends. They would not let their friends pay.

21

(Docket Entry No. 2392, Kayachith's motion to dismiss at 3, Grand Jury Transcript, pages 78 – 79; Docket Entry No. 2645, Trial Transcript at pp.2665-66). In addition, Defendant Yusuf cites Jane Doe Two's failure to mention, prior to her trial testimony, that her trip to Rochester, Minnesota was to go to an apartment for sex.

Defendants argue that Jane Doe Two's testimony about money exchanges for sex are significant and material omissions of material facts given this extensive multi-state investigation of commercial sex trafficking. Defendant Kayachith cites Jane Doe Two's approximately thirty interviews with investigators and prosecutors over the past three and half years. Kayachith argues that Jane Doe's Two's statements about sex for money is not in any of the 50,000 pages of these Jane Doe Two interviews and other documents produced by the Government in this action prior to trial. Kayachith's counsel also cites his pretrial request of Government's lead counsel to provide any report or document reflecting Jane Doe Two's trial testimony on observing the exchange of money for sex with her. The lead Assistant United States Attorney confirmed that there were not any documents or reports reflecting this testimony and explained that not all of the witness's statements are recorded in reports and that Jane Doe Two's Grand Jury testimony only discussed her sex with gang members. Defendants also argue that Jane Doe Two's observation of the money exchange also is not listed in any overt acts in the Second Superseding Indictment nor in the Government's bill of particulars for the trial of this action that was required by Court Order.

The Government's response is that Jane Doe Two's trial testimony about money exchanging hands was an addition to her previous testimony. The Government argues that discrepancies between grand jury testimony and trial testimony are not material and were resolved by the jury. The Government notes that Jane Doe Two also testified that "there was a lot of people that day. It was

22

a long Saturday," (Docket Entry No. 2628, Trial Transcript at p. 926), and cites testimony that Jane Doe Two had free sex with gang members that also was "something of value" for the sex trafficking charges.

As noted earlier, contrary to the Court's discovery orders, the Government produced more than 6,000 pages of agents' notes and emails after the trial started. Among those documents are four pages of undated rough notes, including notes of Heather Weyker, the Government's lead agent.[6] Of these rough notes, only one page contains Weyker's quoted references about Jane Doe Two's statements: "find guys to have sex for money." (Docket Entry No. 2396-1). As to the Nashville trip, the second page of the Weyker rough notes reflects: "Have sex w/guys in TN-she is going to 'be on a money mission'"; "Purpose of her going is to TN is too have sex"; "in car going to TN talked about [Jane Doe Two] mtg guys for sex & $. They ask her." Id. at 2. A second undated rough note reads, in pertinent part: "They leave and go different places and she has sex with a number of different guys. [scratched out ] [Jane Doe Two] had sex in alleys w/different guys." (Docket Entry No. 2396-2). In these statements attributed to Jane Doe Two, Jane Doe Two never actually states that she observed any actual exchange of money for sex with her.

The Court shares the Defendants' concerns that Jane Doe Two's trial testimony is not simply a contradiction with prior statements, but contains material omissions about critical facts that if true, one would expect to have been presented to the grand jury. Yet, these facts about Jane Doe Two seeing money exchanged for sex with her were not presented to the grand jury and the lead agent's

---

[6] Weyker did not testify at trial and after prior hearings in this action, the Court expressed serious concerns about the truthfulness of Weyker's testimony to the grand jury. See Docket Entry No. 1392, Court's Memorandum at 2-3; Docket Entry Nos. 2664 and 2673, July 31, 2012 detention hearing of Abdifitah Sharif Omar (Transcript not prepared).

notes were not produced until after trial started. This evidence was presented to the jury and, notwithstanding these materials omissions, by its verdicts, the jury still found that only three of the Defendants sexually trafficked Jane Doe Two as a minor.

## H. Multiple Conspiracies Claims

The Defendants' next common challenge is that the Government charged a single conspiracy, but actually proved multiple conspiracies at trial that constitutes a material variance requiring the setting aside of their convictions. Defendants argue that the Government's proof established five distinct conspiracies: (1) the Jane Doe Five conspiracy from 2000 to 2006 involving Defendants Adan and Ibrahim; (2) the 2006-2009 conspiracy involving Jane Doe Five and Defendant Adan, Ibrahim and Fadumo Farah; (3) the 2006 to 2007 Jane Doe Two conspiracy involving Defendants Abdullah Hashi, Mohamed Ahmed Amalle, Fuad Nur and Idris Ibrahim Fahra; (3) the May 2007 Rochester trip involving Defendants Fatah Hashi, Hassan Ahmed Dahir and Yassin Abdirahman Yusuf; and (5) the April 2009 Jane Doe Two conspiracy involving Defendants Abdullahi Sade Afyare, Abdikarim Osman Ali, Haji Salad, Yassin Abdirahman Yussuf, Abdirahman Yusuf, Ahmad Abdulnassir Ahmad and Kayachith.

Defendants also cite large time gaps in the Government's proof of any sexual activities involving any Jane Does Two and Five. For Adan's 1999-2000 cited recruitment of Jane Doe Five, Defendant Yusuf is not charged with any acts in the conspiracy until 2007 with Jane Doe Two. The activities involving Jane Doe Two were from November 2006 through May 2007 and later from April 24, 2009 through April 28, 2009. Defendants note that after July 2007, there was not any evidence of Jane Doe Two's sex activity with these Defendants. Jane Doe Two admitted that she did not engage in any prostitution activities during this two year time period. Jane Doe Two testified that

24

she did not discuss prostitution with Defendant Haji Osman Salad, her boyfriend, prior to April 25, 2009. There were Internet communication with Jane Doe Two by Defendant Haji Salad who is Jane Doe Two's boyfriend. Defendant Kayachith is not mentioned as being with Jane Doe Two until April 24, 2009.

The Government describes the factual predicates for the single conspiracy: "Defendant[s] Mohamed Sharif Omar and Liban Sharif Omar are the common threads running through the conspiracy. Mohamed Omar Sharif trafficked [Jane Doe Five]. Mohamed Sharif visited 964 Village Hills Drive looking for girls. Mohammed and Liban plotted to obstruct [Jane Doe Two's] parents from coming to Nashville. Liban rented a room to further the sex trafficking of [Jane Doe Two]. Yusuf was one of the Defendants who brought [Jane Doe Two] from Minnesota to Nashville for the purpose of sex trafficking.

Defendant [Yusuf] has made no argument or submitted any proof that he has ever withdrawn from a conspiracy. Thus, there is enough evidence to support a finding that a single conspiracy existed and Defendant's claim should be denied." (Docket Entry No. 2577 at 9). In opposition to Defendant Kayachith's motion for new trial on this multiple conspiracies contention, (Docket Entry No. 2854), the Government cites to its earlier memoranda on the defense's severance motions. Id. at 1. The Government's earlier memorandum cites in detail the Defendants' participation in a "venture" as defined in 18 U.S.C. § 15(e)(5) and referenced in Section 1591(a)(2). (Docket Entry No. 1152). At the trial, the jury acquitted all Defendants on the venture theory in Count Two.

As to this multiple conspiracies contention, the Second Superseding Indictment in this action charges two counts of conspiracy that were tried. The core of the two conspiracy counts involving thirty defendants, was in sum, that the Defendants:

25

## Count One

did combine, conspire, confederate and agree with each other and others known and unknown to the Grand Jury, to recruit, entice, harbor, transport, provide, obtain, and maintain by any means a person knowing and in reckless disregard of the fact that the person had not attained the age of 14 years and had not attained the age of 18 years and would be caused to engage in a commercial sex act, and knowing and in reckless disregard of the fact that the person had not attained the age of 18 years and that means of force or fraud or a combination of such means would be used to cause a person to engage in a commercial sex act in violation of Title 18, United States Code, Section 1591(a)(1).

## Count Two

did combine, conspire, confederate and agree with each other and others known and unknown to the Grand Jury, to benefit financially and by receiving anything of value, from participation in a venture which engaged in an act of recruiting, enticing, harboring, transporting, providing, obtaining, and maintaining by any means a person knowing and in reckless disregard of the fact that the person had not attained the age of 14 years and had not attained the age of 18 years would be caused to engage in a commercial sex act and knowing and in reckless disregard of the fact that the person had attained the age of 18 years and that means of force or fraud or a combination of such means would be used to cause a person to engage in a commercial sex act in violation of Title 18, United States Code, Section 1591(a)(2).

(Docket Entry No. 591, Second Superseding Indictment at 7-8, 24). The second conspiracy count charged a conspiracy to participate in a "venture" to benefit from the sexual trafficking of minor females. As to Count Two, according to the Government's lead counsel: "It's the same acts that make up the conspiracies." (Docket Entry No. 2645, Transcript at p. 2623). As stated earlier, the jury acquitted these Defendants on Count Two.

Count One of the Second Superseding Indictment listed as victims minors Jane Doe One through Four, (Docket Entry No. 591, Second Superseding Indictment at 8-21), but of these victims, only Jane Doe Two testified at trial. Jane Doe Five testified that Defendant Abdifatah Jama Adan enticed her to prostitution with promises of a better life in 1999-2000 in Minnesota. According to

26

Jane Doe Five, in 2000 Defendant Dahir Ibrahim traveled to Minnesota from Nashville looking for girls to take back to Nashville and asked Jane Doe Five if she wanted to travel to Nashville for prostitution. Jane Doe Five decided to move to Maryland and later moved to Nashville to be with her mother. The Government did not prove that Ibrahim ever actually secured and transported any minor girls from Minneapolis to Nashville nor presents any proof of the ages of any girls. Jane Doe Five opined as to the ages of the females at Defendant Fadumo Farah's apartment in Nashville where Jane Doe Five reconnected with Adan and Defendant Fadumo Farah. Jane Doe Five testified that Fadumo Farah operated a prostitution ring at her apartment, but the jury acquitted Defendant Fadumo Farah of any such conspiracy. At trial, there was not any proof tying Defendant Kayachith or Yusuf or Fahra to Jane Doe Five or Adan or Fadumo Farah.

Jane Doe Two testified that on April 25, 2009 she overheard Haji Salad, Abdullahi Afyare, and Liban Sharif Omar planning a trip to Nashville. In response to Government's counsel's questioning about this conversation, Jane Doe Two testified that Andrew Kayachith and Abdikarim Ali were present, but did not refer to Kayachith participating in this conversation. The jury acquitted Ali. Yet, Jane Doe Two then testified that throughout the day she was driven around to alleys and Haji Salad, Abdullahi Sade Afyare, and Abdikarim Osman Ali were driving looking for people and calling people to see if they wanted to have sex with Jane Doe Two in exchange for money. Jane Doe Two testified "AK", Kayachith, was driving the vehicle. Neither Mohamed nor Liban Omar are tied to this latter activity. Jane Doe Two then testified that she engaged in sex with ten people in which cash money was exchanged. As stated earlier, this testimony differed from Jane Doe Two's prior statements about April 25th that did not contain any reference to sex trafficking on April 25th. In any event, Jane Doe Two described Defendant Haji Salad as the person who collected the money. For

the remainder of April 25, 2009, Jane Doe Two was with Yassin Abdirahman Yusuf. On the morning of April 26, 2009, Jane Doe Two had sex with Biggie without any exchange of money. Kayachith was at the garage where the sex act occurred. Jane Doe Two testified that on the morning of April 26th Abdullahi Afyare contacted a person named "AZ" as a potential purchaser of sex acts, but that sexual act did not occur.

Jane Doe Two testified that the reason she engaged in sex the weekend of April 24, 2009 was because Haji Salad, her boyfriend told her to have sex with them and he was already mad at her so she was trying to please him. The undisputed fact is that Jane Doe Two's sex with the gang members was free. From April 27 through April 28, 2009, Andrew Kayachith is one of five persons who traveled from Minnesota to Nashville, Tennessee with Jane Doe Two. As another tie, the Government cites a jail telephone transcript between Defendants Haji and Liban Omar about preventing Jane Doe Two's family coming to Nashville. Although the transcripts reflect Haji telling Liban Omar to get his brother to talk to Jane Doe Two's family there is not any proof that anyone did so. Further, Mohamed Sharif Omar does not affirmatively state that someone should prevent Jane Doe Two's parents from coming to Nashville. There is a point at which Defendant Salad and Defendant Muhiyadin Hussein Hassan discuss the need for Mohamed Sharif Omar to speak with the parents because Mohamed Omar "is really good with the family." (Docket Entry No. 2636, at p. 2131). Yet, this dialogue amounts to third-party discussion. The jail transcripts also reflect Mohamed Omar castigating Defendant Salad for putting himself in a position to be arrested with Jane Doe Two in Nashville, but the language does not connote conspiratorial behavior, only rebuke.

> **Mohamed**: What did I tell you that day? Didn't I tell you to leave, stupid? Do you remember?

28

**Salad**: Yeah, man. You are the one that put us there.

**Mojo**: Fuck you, man. Didn't I tell you, let's go, let's get out of here. Didn't I tell you that?

(Docket Entry No. 2636, at p. 2121).

The jail transcripts do reveal Mohamed Omar's brothers Defendants, Liban Omar and Abdifatah Sharif Omar ("British"), affirmatively expressing intentions of talking to Jane Doe Two's parents, but the same is not true of Mohamed Omar.

**Liban**: We will talk to her family. Her family will be talked to.

**To British**: You are going to talk to her family; right?

**British**: Yes, I am calling them right now.

**Liban**: We will talk to the girl's family. There you go.

(Docket Entry No. 2636, at p. 2101).

The jail transcripts illustrate Liban Omar's willingness to block Jane Doe Two's parents from coming to Nashville, but Liban Omar does not provide the Government with a conspiratorial link to Jane Doe Five. Mohamed Omar is the person who allegedly approached Jane Doe Five about engaging in commercial sex, but the jury rejected her testimony. The Government also relies on Liban and Mohamed Omar's familial relationship in asserting that Liban and Mohamed worked together to keep Jane Doe Two's family from coming to Nashville. The government asserts that when Liban Omar says "we will talk to the girl's family" in the above conversation, he means that all of the brothers will do so. The Government asserts that the jail telephone transcripts reveal that Liban Omar would get both of his brothers to talk to Jane Doe Two's family.

Liban Omar, through these jail tapes, is discussing, we need to make sure the family – and I will get my brothers, British . . . and [Mohamed], and we'll talk to the family.

29

We know members, and if we can keep them from coming to court, things will get dismissed. That is the connection. That is flows through these people. They are all associated, not only by inference, but in fact. And that is the association. The venture.

(Docket Entry No. 2636, at p 2196). To conclude that the "we" Liban is speaking of above includes Mohamed Omar is speculative as to whom is included in "we." The Government's contention that Mohamed Omar is a common thread in a overarching single conspiracy relies on the premise that "Mohamed and Liban plotted to obstruct Jane Doe Two's parents from coming to Nashville," but the Government did not prove how or when they "plotted." (Docket Entry No. 2577, at 9).

The Government also points to a jail phone conversation exchange between Mohamed and Liban Omar where Mohamed tells Liban that the police know "everything," to buttress its argument for Mohamed Omar's centrality in the conspiracy. The following two excerpts provide two pertinent exchanges:

**Mohamed**: They even know that you are behind everything.

**Liban**: Me?

**Mohamed**: Yes.

**Liban**: Who told you that?

**Mohamed**: You just keep saying who told you? Who told you? It was on TV.

**Liban**: You are lying.

**Mohamed**: I swear to God, I'm not lying.

(Docket Entry No. 2636, at p 2247).

**Mohamed**: I'm not lying to you. Your friend's situation right now, they are kind of digging everything out. I will see what happens. They even said you were the leader.

30

**Liban**: They said my name?

**Mohamed**: Yes, that you are behind the wheels, you know?

(Docket Entry No. 2636, at p 2252). According to the Government, these exchanges illustrate that Mohamed Omar is a fully integrated member of the sex trafficking of Jane Doe Two to Nashville. The excerpts, however, fail to prove that Mohamed Omar played any role in Jane Doe Two's coming to Nashville (i.e., the "situation"), nor to describe the "common thread" of the conspiracy.

At the time of these telephone calls, the outstanding charges against the Defendants were contributing to the delinquency of a minor, Jane Doe Two, not prostitution. Jane Doe Five did not mention any of these Defendants as having any ties to the 964 apartment in Nashboro Village. There was not any evidence that the girls at the Nashboro Village residence were underage and were sexually trafficked. By its verdict on Fadumo Farah, the jury did not credit Jane Doe Five that would include Jane Doe Five's testimony about Adan and Mohamed Sharif Omar. As to Liban Sharif Omar renting a room for Jane Doe Two on April 24th, there is not any evidence of sexual trafficking of Jane Doe Two on that occasion.

## I. The Newly Discovered Evidence

Yusuf asserts that based upon late information produced by the Government at trial, he has learned since the conclusion of the trial from members of the Somalian community that a cousin in Jane Doe Two's family stated that Jane Doe Two was born in 1990 or early 1991. Asha Mohamed, Jane Doe Two's mother's cousin stated to a friend that she was present for Jane Doe Two's birth and cared for Jane Doe Two and her mother after Jane Doe Two's birth. In addition, Yusuf acquired information that Jane Doe Two's parents actually separated in 1991 and did not see each other until 1996 in the United States.

31

After describing a typographical error in an earlier affidavit, Hibo Ali Caabi, the friend to whom Asha Mohamed made these statements, states, in pertinent part:

> 1. I am Hibo Ali Caabi and I reside in Nairobi, Kenya.
>
> 2. .... I am the birth mother of Shararke Adbi Rashid and gave birth to him at the Nairobi Hospital in Kenya on January 23, 1993 and not January 23, 1994 as stated in my first affidavit.
>
> 3. My son's goes by the first name of Sharmarke and not Mohamed as stated on his birth certificate. He has always been known as Sharmarke. Due to complications at birth I was unable to convey to the hospital my wish for this name.
>
> 4. Sometime in late May 2012 after I had signed my first affadavit, a friend of mine, Asha Mohamed, came to visit me in Nairobi. At my house we discussed this case that had recently ended in America. Asha Mohamed is a cousin of Ruux Shiik Yusuf [Jane Doe Two's mother's real name] and presently resides in England. **Asha Mohamed told me that she was present at the birth of both of Ruux Shiik Yusuf's daughters. She told me that both daughters were born in Somolia and that the older daughter, Hani, was born in 1989 and younger daughter, Ayan, was born in late 1990 or early 1991. Asha Mohamed stated she stayed several weeks with Ruux Shiik Yusuf after each birth to help take care of the newborns.**
>
> 5. **Asha Mohamed told me that Ibrahim Mohamed [Jane Doe Two's biological father] and Ruux Shiik met in Qoryoole Somali in 1987 and married that same year. After the births of the two daughters the family moved back to Ruxx Shiik Yusuf's place of birth in Ethiopia. Ibrahim Mohamed Hassan and Ruux Shiik Yusuf separated due to marital problems in 1991. Ibrahim Mohamed Hassan moved to Nairobi Kenya in 1991 leaving his family in Ethiopia. Ibrahim Mohamed Hassan did see his wife and daughters again until they came to America in 1996.**

(Docket Entry No. 2875-2 at 1-2) (emphasis added).

In addition, Yusuf presented proof from Mohamed Abdi Wahab who is listed as Jane Doe Two's brother on her mother's immigration file. In his affidavit, Wahab states that Hibo Ali Caabi is, in fact, his biological mother and he was added to Jane Doe Two's mother's refugee application, as her son, to fit the family profile for refugee status.

32

1. I am Mohamed Abdi Wahab and I reside in Minneapolis  Minnesota.

2. My biological mother is Hibo Ali Caabi who resides in Nairobi Kenya. I was born in Nairobi and my true date of birth is January 23, 1993.

3. My birth name is Mohamed Abdirashid Abdi and my American name is Mohamed Abdi Wahab but I have always been called Sharmarke.

4. I immigrated to the United States with Safia Beledi and her two daughters in 1996. **I am not related to them. Safia Beledi needed a boy to fit the family list for Safia Beledi who was younger than Hani Wahab and older than Ayan Wahab. My age was changed to fit the family profile. I am younger than Ayan Wahab. I have no factual knowledge of exact age (handwritten and initialed)**.

(Docket Entry No. 2875-1 at 1) (emphasis added).

In response to this proof, the Government contends that Caabi's and Wahab's affidavits are inadmissible hearsay and contain double hearsay. As hearsay, the Government argues that neither of these affidavits qualifies as new evidence. Moreover, the Government cites the Defendant's ability to call Jane Doe Two's mother as a witness at trial.

Regardless of the unavailability of Caabi and Asha Mohamed for trial, Rules 803(19) and 804(b)(4)(B) would appear to allow the admissibility of these statements for purposes of the Defendant's motion for a new trial. The Defendants may secure these witnesses for trial by deposition or attendance in which any hearsay contentions would be moot. The Government has had or at a trial would have the opportunity to challenge these statements by calling Jane Doe Two's mother to test the reliability of this evidence.

To provide context for the analysis of the materiality of this evidence, the Jane Does and Defendants are refugees from Somalia. The Government relied upon their immigration records referred to as A-files. These A-files list the names of the refugees' sponsor, the applicant refugee and members of the applicant's family who would also be awarded refugee status. Among the data in the

A-files is each person's date of birth and relationship to the applicant. Jane Doe Two was listed on her mother's A-file with a birth date of September 10, 1994 and listed her father as deceased. With belated disclosures by the United States and based upon his counsel's investigation, Yusuf filed a motion for DNA testing of Jane Doe Two's stepfather whom members of the Somalia community in Minneapolis stated was Jane Doe Two's biological father. The Government opposed Yusuf's motion as groundless, and Jane Doe Two's mother and stepfather filed affidavits (signed by their counsel) denying that the stepfather was Jane Doe Two's biological father and vigorously opposed Yusuf's motion for DNA testing. The Court granted Yusuf's motion, and the DNA test result was that to a 99.99% certainty, Jane Doe Two's stepfather is her biological father. Based upon his arrival in the United States, Jane Doe Two's birth date in her mother's A-file was physically impossible and demonstrably false.

In earlier proceedings, other Defendants asserted that they were minors at the time of the events at issue. After evidentiary hearings, the Court found that proof established the false and highly unreliable nature of the information on these A-files. Refugee applicants fabricated birth dates and listed persons who were not family members on their applications in their A-files. On April 19, 2012, during the trial, Jane Doe Two's mother admitted that she was not the mother of Mohamed Abdi Wahab, whom she listed on her application in her A-file as her son. (Docket Entry No. 2502-1). In other instances, multiple children were given identical days as their birth dates on the refugee applicant's A-file. In an earlier hearing, an immigration official testified that such listings were unlikely to be true and unreliable from the face of the documents. The Court deemed such proof to raise serious issues about the reliability of these A-files.

In addition, a year prior to trial, the Government was aware that Jane Doe Two's mother

34

submitted a false birth certificate for Jane Doe Two to Tennessee authorities seeking victim benefits for Jane Doe Two arising out of the Nashville trip. Jane Doe Two's 2010 application for victim benefits filed with Tennessee authorities contained a statement in which Jane Doe Two actually listed her stepfather as her biological father with whom she was living. The documents submitted to Tennessee officials were first produced during the trial. The purpose of this review of earlier proceedings reveals that only after Government disclosures shortly before or during trial did the Defendants learn relevant and crucial information about Jane Doe Two's birth date.

As to materiality of the Caabi and Whab affidavits, Jane Doe Two's age is a critical element of the Government's proof for a violation of 18 U.S.C. § 1951(a). Evidence from a family member or member of the Somalia community and Jane Doe Two's family friend about Jane Doe's birth is highly probative evidence. It must be remembered that on her website, Jane Doe Two listed her birth date as 1990, a fact consistent with Ahsa Mohamed's statement. Given that the Government did not produce the A-files until trial, the belated disclosures severely limited defense counsel's opportunity to investigate the information in those files during the trial. The presence of witnesses in Africa and England underscores the defense counsel's inability to discover this information prior to trial. This proof that Jane Doe Two was born in 1990 or early 1991 could likely result in an acquittal because the jury's verdict is based upon the Defendants' cited conduct with Jane Doe Two in late April 2009 when Jane Doe Two could have been 19 years old or 18 years old. Such proof, if accepted by the jury, would likely cause an acquittal given the age requirement for a conviction under Section 1951(a).

For these reasons, the Court granted Defendants Yusuf and Kayachith's a new trial.

### J. Conclusions of Law

Under 18 U.S.C. § 3142, a detention hearing

> may be reopened, before or after a determination by the judicial officer, at any time before trial if the judicial officer finds that information exists that was not known to the movant at the time of the hearing and that has a material bearing on the issue whether there are conditions of release that will reasonably assure the appearance of such person as required and the safety of any other person and the community.

18 U.S.C. § 3142(f)(2)(B). To justify reopening a detention hearing, the information must be "sufficiently material to the issue of dangerousness." United States v. Sandles, 9 Fed.Appx. 377, 379 (6th Cir. 2001).

In deciding whether to detain a defendant, 18 U.S.C. § 3142 provides, in relevant part, as follows:

> (e) Detention.--(1) If, after a hearing pursuant to the provisions of subsection (f) of this section, the judicial officer finds that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community, such judicial officer shall order the detention of the person before trial. . . . .

> (3) Subject to rebuttal by the person, it shall be presumed that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community if the judicial officer finds that there is probable cause to believe that the person committed–

> (E) an offense involving a minor victim under section 1201, 1591, 2241, 2242, 2244(a)(1), 2245, 2251, 2251A, 2252(a)(1), 2252(a)(2), 2252(a)(3), 2252A(a)(1), 2252A(a)(2), 2252A(a)(3), 2252A(a)(4), 2260, 2421, 2422, 2423, or 2425 of this title.

> (f) Detention hearing.--The judicial officer shall hold a hearing to determine whether any condition or combination of conditions set forth in subsection (c) of this section will reasonably assure the appearance of such person as required and the safety of any other person and the community–

> (1) upon motion of the attorney for the Government, in a case that involves--

> (A) a crime of violence, a violation of section 1591, or an offense listed in section 2332b(g)(5)(B) for which a maximum term of imprisonment of 10 years or more is prescribed;

36

(B) an offense for which the maximum sentence is life imprisonment or death;

(C) an offense for which a maximum term of imprisonment of ten years or more is prescribed in the Controlled Substances Act (21 U.S.C. 801 et seq.), the Controlled Substances Import and Export Act (21 U.S.C. 951 et seq.), or chapter 705 of title 46;

(D) any felony if such person has been convicted of two or more offenses described in subparagraphs (A) through (C) of this paragraph, or two or more State or local offenses that would have been offenses described in subparagraphs (A) through © of this paragraph if a circumstance giving rise to Federal jurisdiction had existed, or a combination of such offenses; or

(E) any felony that is not otherwise a crime of violence that involves a minor victim or that involves the possession or use of a firearm or destructive device (as those terms are defined in section 921), or any other dangerous weapon, or involves a failure to register under section 2250 of title 18, United States Code; or

(2) Upon motion of the attorney for the Government or upon the judicial officer's own motion, in a case that involves-- (A) a serious risk that such person will flee; or

(B) a serious risk that such person will obstruct or attempt to obstruct justice, or threaten, injure, or intimidate, or attempt to threaten, injure, or intimidate, a prospective witness or juror.

18 U.S.C. § 3142(e)(1), (e)(3)(E), (f)(1)-(2).

In deciding the detention issue, the Court must consider the following factors:

(g) Factors to be considered.--The judicial officer shall, in determining whether there are conditions of release that will reasonably assure the appearance of the person as required and the safety of any other person and the community, take into account the available information concerning–

(1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence, a violation of section 1591, a Federal crime of terrorism, or involves a minor victim or a controlled substance, firearm, explosive, or destructive device;

(2) the weight of the evidence against the person;

(3) the history and characteristics of the person, including--

(A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history

relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and

(B) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and

(4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release. In considering the conditions of release described in subsection (c)(1)(B)(xi) or (c)(1)(B)(xii) of this section, the judicial officer may upon his own motion, or shall upon the motion of the Government, conduct an inquiry into the source of the property to be designated for potential forfeiture or offered as collateral to secure a bond, and shall decline to accept the designation, or the use as collateral, of property that, because of its source, will not reasonably assure the appearance of the person as required.

18 U.S.C. § 3142(g). If the motion to detain is denied, then the Court must set conditions of

release, with special conditions for crimes involving a minor.[7]

---

[7]Release on conditions.--(1) If the judicial officer determines that the release described in subsection (b) of this section will not reasonably assure the appearance of the person as required or will endanger the safety of any other person or the community, such judicial officer shall order the pretrial release of the person--

(A) subject to the condition that the person not commit a Federal, State, or local crime during the period of release and subject to the condition that the person cooperate in the collection of a DNA sample from the person if the collection of such a sample is authorized pursuant to section 3 of the DNA Analysis Backlog Elimination Act of 2000 (42 U.S.C. 14135a); and

(B) subject to the least restrictive further condition, or combination of conditions, that such judicial officer determines will reasonably assure the appearance of the person as required and the safety of any other person and the community, which may include the condition that the person--

(i) remain in the custody of a designated person, who agrees to assume supervision and to report any violation of a release condition to the court, if the designated person is able reasonably to assure the judicial officer that the person will appear as required and will not pose a danger to the safety of any other person or the community;

(ii) maintain employment, or, if unemployed, actively seek employment;

(iii) maintain or commence an educational program;

(iv) abide by specified restrictions on personal associations, place of abode, or travel;

(v) avoid all contact with an alleged victim of the crime and with a potential witness who may testify concerning the offense;

(vi) report on a regular basis to a designated law enforcement agency, pretrial services agency, or other agency;

(vii) comply with a specified curfew;

38

In <u>United States v. Salerno</u>, 481 U.S. 739 (1987), the Supreme Court upheld Section 3142

against constitutional challenges because detention involved a regulatory function of protection of

the community, not interim punishment for being charged with certain offenses:

> **We conclude that the detention imposed by the Act falls on the regulatory side of the dichotomy. The legislative history of the Bail Reform Act clearly indicates that Congress did not formulate the pretrial detention provisions as punishment for dangerous individuals. See S.Rep. No. 98-225, at 8. Congress instead perceived pretrial detention as a potential solution to a pressing societal problem.** <u>Id</u>., at 4-7.

> The Bail Reform Act carefully limits the circumstances under which detention may be sought to the most serious of crimes.

---

(viii) refrain from possessing a firearm, destructive device, or other dangerous weapon;

(ix) refrain from excessive use of alcohol, or any use of a narcotic drug or other controlled substance, as defined in section 102 of the Controlled Substances Act (21 U.S.C. 802), without a prescription by a licensed medical practitioner;

(x) undergo available medical, psychological, or psychiatric treatment, including treatment for drug or alcohol dependency, and remain in a specified institution if required for that purpose;

(xi) execute an agreement to forfeit upon failing to appear as required, property of a sufficient unencumbered value, including money, as is reasonably necessary to assure the appearance of the person as required, and shall provide the court with proof of ownership and the value of the property along with information regarding existing encumbrances as the judicial office may require;

(xii) execute a bail bond with solvent sureties; who will execute an agreement to forfeit in such amount as is reasonably necessary to assure appearance of the person as required and shall provide the court with information regarding the value of the assets and liabilities of the surety if other than an approved surety and the nature and extent of encumbrances against the surety's property; such surety shall have a net worth which shall have sufficient unencumbered value to pay the amount of the bail bond;

(xiii) return to custody for specified hours following release for employment, schooling, or other limited purposes; and

(xiv) satisfy any other condition that is reasonably necessary to assure the appearance of the person as required and to assure the safety of any other person and the community.
In any case that involves a minor victim under section 1201, 1591, 2241, 2242, 2244(a)(1), 2245, 2251, 2251A, 2252(a)(1), 2252(a)(2), 2252(a)(3), 2252A(a)(1), 2252A(a)(2), 2252A(a)(3), 2252A(a)(4), 2260, 2421, 2422, 2423, or 2425 of this title, or a failure to register offense under section 2250 of this title, any release order shall contain, at a minimum, a condition of electronic monitoring and each of the conditions specified at subparagraphs (iv), (v), (vi), (vii), and (viii).

18 U.S.C. § 3142(c)(1).

39

\* \* \*

**We have repeatedly held that the Government's regulatory interest in community safety can, in appropriate circumstances, outweigh an individual's liberty interest.**

\* \* \*

**We have approved of postarrest regulatory detention of juveniles when they present a continuing danger to the community.**

**The government's interest in preventing crime by arrestees is both legitimate and compelling.**

Id. at 747, 748, 749 (emphasis added).

The Supreme Court also noted that detention is usually reserved for "extremely serious offenses" where the facts of a given case demonstrate that the Government's interests are "overwhelming."

> The Bail Reform Act, in contrast, narrowly focuses on a particularly acute problem in which the Government interests are overwhelming. The Act operates only on individuals who have been arrested for a specific category of extremely serious offenses. 18 U.S.C. § 3142(f). Congress specifically found that these individuals are far more likely to be responsible for dangerous acts in the community after arrest. .. . **The Government must first of all demonstrate probable cause to believe that the charged crime has been committed by the arrestee, but that is not enough. In a full-blown adversary hearing, the Government must convince a neutral decisionmaker by clear and convincing evidence that no conditions of release can reasonably assure the safety of the community or any person. 18 U.S.C. § 3142(f). While the Government's general interest in preventing crime is compelling, even this interest is heightened when the Government musters convincing proof that the arrestee, already indicted or held to answer for a serious crime, presents a demonstrable danger to the community. Under these narrow circumstances, society's interest in crime prevention is at its greatest.**

\* \* \*

> We think that Congress' careful delineation of the circumstances under which detention will be permitted satisfies this standard. When the Government proves by clear and convincing evidence that an arrestee presents an identified and articulable threat to an individual or the

40

community, we believe that, consistent with the Due Process Clause, a court may disable the arrestee from executing that threat.

Id. at 750, 751.

The Sixth Circuit set forth the burden shifting evidentiary framework for detention hearings based upon dangerousness:

> Under the Bail Reform Act, 18 U.S.C. § 3142, upheld . . . in <u>Salerno</u>, a defendant may be detained pending trial only if a judicial officer "finds that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community[.]" 18 U.S.C. § 3142(e). A judicial officer's finding of dangerousness must be "supported by clear and convincing evidence." 18 U.S.C. § 3142(f)(2)(b). The default position of the law, therefore, is that a defendant should be released pending trial.
>
> That default is modified, however, for certain, particularly dangerous defendants. Specifically, when a "judicial officer finds that there is probable cause to believe" that a defendant committed one of the crimes listed in section 3142(e)(3), there is a presumption in favor of detention: "Subject to rebuttal by the person, it shall be presumed that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community[.]" 18 U.S.C. § 3142(e)(3). A grand jury indictment, by itself, establishes probable cause to believe that a defendant committed the crime with which he is charged <u>Hazime</u>, 762 F.2d at 37. Thus, **when the government presents an indictment including charges listed in section 3142(e)(3), it has fulfilled its burden to establish the presumption in favor of detention.**
>
> As our sister circuits have found, section 3142(e)(3)'s presumption in favor of detention imposes only a "burden of production" on the defendant, and the government retains the "burden of persuasion." <u>See</u>, <u>e.g.</u>, <u>United States v. Mercedes</u>, 254 F.3d 433, 436 (2nd Cir. 2001); <u>United States v. Portes</u>, 786 F.2d 758, 764 (7th Cir. 1985). **A defendant satisfies his burden of production when he "com[es] forward with evidence that he does not pose a danger to the community or a risk of flight." <u>Mercedes</u>, 254 F.3d at 436. Although a defendant's burden of production "is not heavy," he must introduce at least some evidence.** <u>United States v. Stricklin</u>, 932 F.2d 1353, 1355 (10th Cir. 1991); <u>see also</u> <u>United States v. Rodriguez</u>, 950 F.2d 85, 88 (2d Cir. 1991) ("[A] defendant must introduce some evidence contrary to the presumed fact in order to rebut the presumption.").
>
> **Even when a defendant satisfies his burden of production, however, "the presumption favoring detention does not disappear entirely, but remains a factor to be considered among those weighed by the district court." <u>Mercedes</u>, 254 F.3d at 436. The presumption remains as a factor because it is not simply an evidentiary tool designed**

41

**for the courts. Instead, the presumption reflects Congress's substantive judgment that particular classes of offenders should ordinarily be detained prior to trial.** See United States v. Jessup, 757 F.2d 378, 384 (1st Cir. 1985), abrogated on other grounds by United States v. O'Brien, 895 F.2d 810 (1st Cir. 1990), ("Congress intended magistrates and judges, who typically focus only upon the particular cases before them, to take account of the more general facts that Congress found"); see also United States v. Dominguez, 783 F.2d 702, 707 (7th Cir. 1986) ("[T]he presumption of dangerousness ... represents Congressional findings that certain offenders ... are likely to continue to engage in criminal conduct undeterred either by the pendency of charges against them or by the imposition of monetary bond or other release conditions."). To rebut the presumption, therefore, a defendant should "present all the special features of his case" that take it outside "the congressional paradigm [.]" Jessup, 757 F.2d at 387.

Stone, 608 F.3d 939, 945-46 (6th Cir. 2010) (emphasis added).

Although Section 3142 permits the admission of hearsay evidence to meet the clear and convincing standard, the hearsay evidence must be reliable. United States v. Thomas, 2006 WL 140558, at *9 (D. Md. 2006).

[T]he Court must nevertheless ensure that the evidence upon which it relies is reliable. United States v. Goba, 240 F. Supp. 2d 242, 247 (W.D.N.Y. 2003). . . United States v. LaFontaine, 210 F.3d 125, 131 (2d Cir. 2000) (explaining that magistrate judges must ensure reliability "by selectively insisting upon the production of the underlying evidence or evidentiary sources where their accuracy is in question") (internal citations omitted)); United States v. Acevedo-Ramos, 755 F.2d 203, 206-08 (1st Cir. 1985) (assuming that evidence used for purposes of detention determinations must be reliable); United States v. Accetturo, 623 F. Supp. 746, 755 (D.N.J. 1985).

Id.

A detention hearing may be conducted by the parties' proffers in the discretion of the court. Stone, 608 F.3d at 948-49 (citing with approval United States v. Webb, 238 F.3d 426 (table), 2000 WL 1721060, at *2 (6th Cir. 2000)) ("[T]the government may proceed in a detention hearing by proffer or hearsay."); United States v. Smith, 79 F.3d 1208, 1210 (D.C. Cir. 1996) ("Every circuit to have considered the matter ... [has] permitted the Government to proceed by way of proffer.").To reconsider detention, the Court requires proof of changed circumstances.

42

Here, the trial and post-trial proceedings have produced evidence since the earlier detention hearings that warrants reconsideration of these Defendants' continued detention. Considering the nature and weight of the evidence set forth above, the Court is no longer persuaded that these Defendants are a danger to the community for whom there are no appropriate conditions of release. Jane Doe Two's actual age is a strenuously contested issue. As to the sexual charges, the proof was that Jane Doe Two actively and repeatedly sought out the Defendants. According to a Government witness and friend, Jane Doe Two voluntarily engaged in repeated sexual acts. Hughes, another Government witness testifying under a grant of immunity, stated that he was scheduled to go on the Nashville trip and Jane Doe Two was a last minute substitute for him. In addition, Hughes testified that there was not any prostitution by any of the Defendants on that trip because he would have known about any such activity. Jane Doe Two initially told police officers that the Nashville trip was to secure automobile parts. Other Defendants are tied to a conspiracy to transport stolen automobile parts. The proof did not establish these Defendants as sexual predators. The jury did not credit Jane Doe Five's testimony. The Court notes that these Defendants have been on release with conditions for several months without significant violations of their conditions. The Court concludes that an appropriate combination of conditions of release have been imposed to assure the safety of the community and protect against any serious flight risks.

The Court is also concerned that the Defendant's continued detention had become punishment, United States v. Orena, 986 F.2d 628, 630-31. (2nd Cir. 1993), not the regulatory purpose of the detention statutes under Salerno. See United States v. Cos, 198 Fed. Appx. 727, 731 (10th Cir. 2006). Some Defendants have been detained for a period equal to or beyond the guidelines range for the offenses to which they pled guilty.

43

In sum, the Court concludes that based upon the proof at trial and post-trial, these Defendants are no longer a danger to the community and that a combination of conditions of pretrial release can protect the community against any possible danger.

The appropriate Orders of release have been entered.

Entered this the 9th day of May, 2013.

William J. Haynes, Jr.
Chief Judge
United States District Court

44